Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| In the Matter of the Search of | |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address* | |
| *DNA associated with TERRANCE CLEYON PEARSON, date of birth December 19, 1979, currently in custody of the Florence Correctional Center in Florence, Arizona.* | Case No. 22-020 MB |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ____Arizona____.
(identify the person or describe the property to be searched and give its location):

### As further described in Attachment A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before ____January 20, 2022____.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty.

_____.
        *(name)*

N/A  ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for 30 days *(not to exceed 30)*
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _January 6, 2022 @ 3:40 pm_          _Michelle Burns_
                                                                                              *Judge's signature*

City and State: ___Phoenix, AZ___          MICHELLE H. BURNS, U.S. Magistrate Judge
                                                                    *Printed name and title*

## ATTACHMENT A

### Person to Be Searched

This warrant applies to the body of TERRANCE CLEYON PEARSON, date of birth December 19, 1979, ("PEARSON"), defendant in CDCA 2:21-cr-0065-FLA for a DNA Buccal Swabs to compare to DNA collected in connection with a robbery committed on October 25, 2019.  PEARSON is reportedly in the custody of the U.S. Marshal's Service at the Florence Correctional Center in Florence, Arizona.  His Bureau of Prisons Registration Number is 75333-509.

**ATTACHMENT B**

**Particular Things to be Seized**

Evidence in the form of:

1.  The body of TERRANCE CLEYON PEARSON, date of birth December 19, 1979, ("PEARSON"), defendant in CDCA 2:21-cr-0065-FLA, for the collection of DNA through Buccal Swabs.  PEARSON is reportedly in the custody of the Florence Correctional Center in Florence, Arizona.  His Bureau of Prisons Registration Number is 75333-509.

Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br>*DNA associated with TERRANCE CLEYON PEARSON, date of birth December 19, 1979, currently in custody of the Florence Correctional Center in Florence, Arizona.* | Case No.  22-020MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, SA Lisa Shanahan, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**As further described in Attachment A.**

Located in the District of ___Arizona___ , there is now concealed *(identify the person or describe the property to be seized)*:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy and Aiding and Abetting the Interfere with Commerce by Robbery |
| 18 U.S.C §§ 924(c)(i), (ii), (iii) | Aiding and Abetting the Possession, Use, Carrying, Brandishing, and Discharging of a Firearm in Furtherance of a Crime of Violence |

The application is based on these facts:
**As set forth in Attachment C, incorporated herein by reference.**

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Brett A. Day   *BDay*
*Sworn Telephonically*

_____
*Applicant's Signature*

Lisa Shanahan, SA, FBI
*Applicant's printed name and title*

Date issued: January 6, 2022

_____
*Judge's signature*

City and State: _____

MICHELLE H. BURNS, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Person to Be Searched

This warrant applies to the body of TERRANCE CLEYON PEARSON, date of birth December 19, 1979, ("PEARSON"), defendant in CDCA 2:21-cr-0065-FLA for a DNA Buccal Swabs to compare to DNA collected in connection with a robbery committed on October 25, 2019. PEARSON is reportedly in federal custody at the Florence Correctional Center in Florence, Arizona. His Bureau of Prisons Registration Number is 75333-509.

## ATTACHMENT B

### Particular Things to be Seized

Evidence in the form of:

1. The body of TERRANCE CLEYON PEARSON, date of birth December 19, 1979, ("PEARSON"), defendant in CDCA 2:21-cr-0065-FLA, for the collection of DNA through Buccal Swabs.  PEARSON is reportedly in the custody of the Florence Correctional Center in Florence, Arizona.  His Bureau of Prisons Registration Number is 75333-509.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

**A SEARCH WARRANT**

I, Lisa Shanahan, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION**

The facts of this case, as more fully detailed in Exhibit A, which is attached and incorporated by reference as if set forth fully herein, are that on October 25, 2021, TERRANCE CLEYON PEARSON ("PEARSON") and others committed an armed robbery of the retail store Party City where PEARSON discharged a firearm in furtherance of that robbery, in violation of 18 U.S.C. § 1951(a) (Conspiracy and Aiding and Abetting the Interfere with Commerce by Robbery and Interference with Commerce by Robbery); 18 U.S.C. § 924(c)(1)(A) (Aiding and Abetting the Possession, Use, Carrying, Brandishing, and Discharging of a Firearm in Furtherance of a Crime of Violence). Just after the robbery concluded, law enforcement arrived and located clothing which appeared to match some of the clothing worn by the robbers as seen in later recovered surveillance footage from Party City. Law enforcement also recovered a firearm which appeared to match the firearm discharged by one of the robbers. Law enforcement was able to extract DNA samples for analysis from multiple portions of the firearm and the articles of clothing recovered near the Party City. These DNA samples were submitted to be compared against the Combined DNA Index System ("CODIS") a database populated with DNA samples. The comparison between a few of the collected samples and the CODIS system resulted in a DNA hit for PEARSON's DNA as the majority contributor from at least the "California Republic" baseball hat found near the scene of the Party City robbery.[1]

[1] Not all samples collected from the discarded articles of clothing and the firearm were submitted to CODIS to check for hits in the CODIS database, because law enforcement does not submit what appears to be duplicative identical DNA samples to CODIS, even if they are found on different items in the same matter. Therefore, if law enforcement receives a confirmatory sample of PEARSON's DNA as a result of this warrant, PEARSON's DNA might match more than just the majority of the DNA that was found on the "California Republic" baseball hat.

1

1   This warrant is to obtain a DNA reference sample from PEARSON for direct

2   comparison to the DNA samples obtained from the clothing and handgun recovered near the

3   paths of escape of the robbers from the Party City robbery.[2]

4   On or about July 12, 2021, the Honorable Steve Kim U.S. Magistrate Judge for the

5   Central District of California, approved a warrant for a DNA sample for PEARSON in

6   connection with this robbery.  The application for this warrant is attached as Exhibit A and is

7   incorporated into this warrant as if fully enumerated herein.  Unfortunately, law enforcement

8   was unable to apprehend PEARSON before the expiration of this warrant, and now PEARSON

9   is located in the District of Arizona, in Florence Correctional Center according to the U.S.

10   Marshals Service.  To my knowledge, everything in Exhibit A is still accurate to the best of my

11   knowledge and I adopt and incorporate that affidavit into this application.

12   I make this affidavit in support of an application for a search warrant, to obtain DNA to

13   include the taking of buccal swabs from the body of PEARSON, who is currently in federal

14   custody at the Florence Correctional Center in Florence, Arizona, in support of an investigation

15   into the aforementioned crime.

## PRELIMINARY BACKGROUND INFORMATION

17   Your affiant is a Special Agent ("SA") with the Federal Bureau of Investigation

18   ("FBI"), United States Department of Justice, and have been so employed since July 2015.

19   Your affiant is a federal agent and am empowered by United States law to conduct

20   investigations of, and make arrests for, inter alia offenses enumerated in Title 18 of the United

21   States Code.  My training and experience includes the training provided by the Federal Bureau

22   of Investigation Academy located in Quantico Virginia. During the Basic Field Training

23   Course, I learned the necessary skills, tactics, and techniques needed to perform my

24   investigative duties as a Special Agent of the FBI.  During this training, I have learned how to

25

26   Furthermore, there were additional CODIS hits and later confirmed DNA samples for two other co-conspirators in the
robbery on other items collected from the scene.

27

28   [2] The requested reference DNA sample from PEARSON for direct comparison with the collected items of evidence is
necessary to confirm the CODIS results and to be admissible at trial.  The DNA hit to the CODIS database alone, from a
sample purportedly taken from PEARSON at some point in the past, is likely inadmissible at trial on its own.

1   conduct investigations of criminal activity, execute search and arrest warrants, and seize

2   evidence of violations of United States law.

3         I am currently assigned to the Los Angeles Field Office and have been on the Los

4   Angeles Metropolitan Violent Crimes Task Force since 2017. I have worked on investigations

5   involving fugitives, kidnappings, assaults, firearms, money laundering and robberies. During

6   these investigations I have used a variety of investigative techniques, including interviews,

7   examining physical evidence, conducting surveillance, and reviewing financial and telephone

8   records. I have attended trainings and conferences pertaining the investigations of robberies

9   and violent crimes.

10        As a result of this experience and my conversations with other law enforcement

11  personnel, to include FBI Special Agents and Los Angeles County Sheriff's ("LASD")

12  Detectives experienced with commercial robbery investigations, I am familiar with the

13  methods used by individuals to commit commercial robberies, where evidence of those

14  robberies is stored or saved, as well as effective investigative methods to solve them.

15        The facts in this affidavit come from my personal observations, my training and

16  experience, and information obtained from other agents, officers, investigators and witnesses.

17  This affidavit is intended to show merely there is sufficient probable cause for the requested

18  warrant and does not set forth all of my knowledge about this matter. I have set forth only the

19  facts I believe are necessary to establish probable cause to believe evidence of a violations of

20  18 U.S.C. § 1951(a) and 18 U.S.C. § 924(c)(1)(A) is located on the person of PEARSON,

21  more fully described in Attachment A, for items listed in Attachment B.  This Court has

22  jurisdiction over this warrant because PEARSON is located within the district of Arizona.

23                              **CONCLUSION**

24        Based on the aforementioned factual information in Attachment C and Exhibit A, I

25  respectfully submit that there is probable cause to believe that evidence described in

26  Attachment B, is located on the body of PEARSON, as more fully described in Attachment A,

27  and will support an investigation related to a violations of 18 U.S.C. § 1951(a) and 18 U.S.C.

28

1    § 924(c)(1)(A).  This affidavit was sworn telephonically before a United States Magistrate

2    Judge legally authorized to administer an oath for this purpose.

3         I declare under penalty of perjury under the laws of the United States of America that

4    the foregoing is true and correct.

5    Dated: __01/06/2022__       _Lisa Shanahan_

6                           Special Agent Lisa Shanahan

7                           Federal Bureau of Investigation

8

9    Subscribed and sworn telephonically this __6__ day of January, 2022.

10

11                           _Michelle Burns_

12                           Honorable Michelle H. Burns

13                           United States Magistrate Judge

14                           District of Arizona

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>the person of TERRANCE CLEYON PEARSON ("PEARSON"),<br>believed to be residing at 38931 9th Street East, Palmdale, California.<br>including but not limited to, property in PEARSON's possession and a<br>buccal swab from the cheek of PEARSON for a sample of PEARSON's<br>Deoxyribonucleic Acid (DNA) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Case No. 2:21-Mj-03268 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-4*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy and Aiding and Abetting the Interfere with Commerce by Robbery and Interference with Commerce by Robbery |
| 18 U.S.C §§ 924(c)(i), (ii), (iii) | Aiding and Abetting the Possession, Use, Carrying, Brandishing, and Discharging of a Firearm in Furtherance of a Crime of Violence |

The application is based on these facts:
*See attached Affidavit*
☒ Continued on the attached sheet.

/s/ Daniel Ament
_____
*Applicant's signature*

FBI TFO/LASD Sheriff's Detective Daniel Ament
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 7/12/2021
_____
*Judge's signature*

City and state: Los Angeles, CA

HON. STEVE KIM, U.S. MAGISTRATE JUDGE
*Printed name and title*

AUSA: Lara x0427

## AFFIDAVIT

I, Daniel Ament, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a peace officer for the Los Angeles County Sheriff's Department ("LASD") and have been so employed since 2006.  I am currently a sworn Task Force Officer ("TFO") for the joint Federal Bureau of Investigations/Los Angeles County Sheriff's Department Los Angeles Metropolitan Violent Crime Task Force.

2.   I have received training in the Los Angeles County Sheriff's Department Academy, Jail Operations, Patrol School, and Investigator Training relating to crimes and investigations associated with firearms, robberies, assaults, and street gangs. I have attended a forty-hour training class regarding the cellular telephone network, records, and mapping.

3.   I have been assigned to primarily investigate robberies since 2011.  During those investigations, I have used a variety of investigative techniques, including victim, witness and suspect interviews, examining physical evidence, and reviewing surveillance videos, cellular telephone data and social media accounts.  As a result of this experience and my conversations with other law enforcement personnel, to include FBI Special Agents and other LASD Detectives experienced with commercial robbery investigations, I am familiar with the methods used by individuals to commit commercial robberies, where evidence of those robberies is stored or saved, as well as effective investigative methods to solve them.

1

## II.  **PURPOSE OF AFFIDAVIT**

4.   This affidavit is made in support of an application for a warrant to search the premises located at 38931 9th Street East, Palmdale, California (the "SUBJECT RESIDENCE"); a silver Mercedes bearing California license plate of 8GJJ909 ("SUBJECT VEHICLE #1") and a black Dodge Charger with a California license plate of 8EPB809 ("SUBJECT VEHICLE #2") (collectively the "SUBJECT VEHICLES"); the person of TERRANCE CLEYON PEARSON ("PEARSON" or the "SUBJECT PERSON") including, but not limited to, the application to obtain a sample of PEARSON's Deoxyribonucleic acid ("DNA") via buccal cheek swab, more fully described below and in Attachments A-1, A-2, A-3, and A-4, respectively, which are attached hereto and incorporated herein by reference, for the items to be seized described in Attachments B-1 and B-2 which are the evidence, fruits, and instrumentalities of violations of: 18 U.S.C. § 1951(a) (Conspiracy and Aiding and Abetting the Interfere with Commerce by Robbery and Interference with Commerce by Robbery); 18 U.S.C. § 924(c)(1)(A) (Aiding and Abetting the Possession, Use, Carrying, Brandishing, and Discharging of a Firearm in Furtherance of a Crime of Violence) (the "SUBJECT OFFENSES").

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  LOCATIONS TO BE SERACHED

6.    The SUBJECT RESIDENCE is located at 38931 9th Street East, Palmdale, California.  For the reasons described below, I believe it is the rear/west unit, in a single-story duplex.  The exterior has blue stucco, white trim, a composite roof and a black security screen front door, which faces south.  The premises contains two mailboxes marked with the numbers "38929" and "38931".  The two units in the duplex are not individually marked, but similar surrounding structures suggest that the rear unit, which is associated with PEARSON, is the SUBJECT RESIDENCE.

7.    SUBJECT VEHICLE #1 is a silver Mercedes bearing California license plate 8GJJ909 with a release of liability to TERRANCE PEARSON.

8.    SUBJECT VEHICLE #2 is a black Dodge Charger bearing California license plate 8EPB809 with a release of liability to TERRANCE PEARSON.

### IV.   PERSON TO BE SEARCHED

9.    The SUBJECT PERSON to be searched is PEARSON, date of birth December 19, 1979, currently indicted and subject to an arrest warrant issued in case number 2:21-cr-0065-FLA, Docket 18, in the Central District of California (the "Indictment"). The Indictment is attached as Exhibit 1, and is incorporated

herein by reference into this warrant.  I believe PEARSON is residing at the SUBJECT RESIDENCE, as described further below.

## V.   SUMMARY OF PROBABLE CAUSE

10.  As detailed in the complaint affidavit filed in case number 2:21-cr-0065-FLA, in the Central District of California (the "Complaint"), and the Indictment in the same matter (Exhibit 1), there have already been probable cause determinations that PEARSON, among others, participated in the SUBJECT OFFENSES committed on October 25, 2019, at Party City in Palmdale, California, as part of a larger series of robberies. The Complaint is attached as Exhibit 2 and is incorporated herein by reference into this warrant.

11.  This affidavit establishes that there is probable cause that the search of the SUBJECT RESIDENCE, SUBJECT VEHICLES, PEARSON's Person for PEARSON's DNA will provide additional evidence of the SUBJECT OFFENSES.

## VI.   STATEMENT OF PROBABLE CAUSE

### A.   The Party City Robbery DNA

12.  On October 25, 2019, as described in greater detail in the Indictment and Complaint attached hereto and incorporated by reference as Exhibits 1 and 2, an armed robbery occurred at a Party City in Palmdale, California, located at 39451 10th Street West (the "Party City robbery"), among other robberies.

13.  The Party City robbery, which was captured on video, showed that at least one of the robbers carried a handgun, at least one robber wore a baseball hat, and multiple robbers wore sweatshirts, gloves, masks, and other articles of clothing.

4

14.  As described in further detail in Exhibits 1 and 2, on
October 25, 2019, at approximately 5:50 a.m., witnesses
describe, and surveillance footage subsequently showed, that
multiple robbers, at least one of which was armed with a loaded
firearm, entered, and robbed a Party City in Palmdale,
California located at 39451 10th Street West.  During the
robbery, multiple robbers ran into the Party City.  Two of the
robbers entered the rear office.  One robber appeared to be
holding a black semi-automatic handgun in one hand.  Another
robber collected money and placed it into a black duffle bag.
At approximately 5:51 a.m., two of the robbers, believed to be
PEARSON and another co-conspirator based on the CODIS DNA hits
on matching articles of clothing later recovered, returned to
the front doors and attempted to exit, but quickly discovered
the sliding glass doors were locked.  The robbers attempted to
push, kick and ram the doors open with a shopping cart, however
the door remained closed. One of the robbers produced a black
semi-automatic handgun from his waist band and fired a round at
the door, shattering the glass.  The two robbers escaped through
the broken door and ran northeast through the parking lot.
Based on the surveillance video and the later CODIS DNA hit on
an article of clothing for PEARSON's DNA, the robber that
appeared to be PEARSON appeared to be wearing a face covering, a
hat, gloves, black shorts with black vertical stripe, and black
shoes with a white logo on the sides.

15.  At approximately 5:53 a.m., the third robber with the
duffle bag containing the stolen money approached the broken

front door. The robber was holding his left hand to the left side of his face and appeared to be using a cellphone.   The robber then went back into the store and is believed to have exited from a different door.

16.   After the Party City robbery concluded, LASD deputies responded to the Party City robbery location, canvassed the area, and located clothing and a stolen black Sig Sauer semi-automatic handgun which appeared to have been discarded near neighboring businesses.   The clothing and handgun were recovered near the paths of escape of the robbers from the Party City robbery.   The clothing items matched clothing worn by the suspects and the handgun appeared to be the same handgun used during the robbery as captured by surveillance video.

17.   Law enforcement was able to extract DNA samples for analysis from multiple portions of the firearm and the articles of clothing recovered near the Party City.   These DNA samples were submitted to be compared against the Combined DNA Index System ("CODIS") a database populated with DNA samples.   The comparison between a few of the collected samples and the CODIS system resulted in a DNA hit for PEARSON's DNA as the majority contributor from at least the "California Republic" baseball hat found near the scene of the Party City robbery.[1]

_____

[1] Not all samples collected from the discarded articles of clothing and the firearm were submitted to CODIS to check for hits in the CODIS database, because law enforcement does not submit what appears to be duplicative identical DNA samples to CODIS, even if they are found on different items in the same matter.   Therefore, if law enforcement receives a confirmatory sample of PEARSON's DNA as a result of this warrant, PEARSON's
*(footnote cont'd on next page)*

18.   This warrant is, in part, to obtain a DNA reference sample from PEARSON for direct comparison to the DNA samples obtained from the clothing and handgun recovered near the paths of escape of the robbers from the Party City robbery.[2]   .

**B.   Identification of PEARSON's Residence and Vehicles**

19.   Both the Complaint and Indictment charging PEARSON for the October 25, 2019, Party City robbery establish that there is probable cause he was involved in the robbery, and are summarized above.

20.   The probable cause established in both the Complaint and Indictment, as summarized in part above, is incorporated herein and further establishes probable cause in this Warrant that PEARSON committed the SUBJECT OFFENSES.

21.   After the robbery, law enforcement attempted to locate PEARSON.   A search of records for PEARSON using a law enforcement database revealed that PEARSON is associated with the address 38931 9th Street East, Palmdale, California, the SUBJECT RESIDENCE.   On May 5, 2021, law enforcement went to 38931 9th Street East, Palmdale and saw the SUBJECT RESIDENCE was part of a single-story duplex with two numbered addresses,

---

DNA might match more than just the majority of the DNA that was found on the "California Republic" baseball hat.

Furthermore, there were additional CODIS hits for two other co-conspirators in the robbery on other items collected from the scene, as detailed in the Complaint.

[2] The requested reference DNA sample from PEARSON for direct comparison with the collected items of evidence is necessary to confirm the CODIS results and to be admissible at trial.   The DNA hit to the CODIS database alone, from a sample purportedly taken from PEARSON at some point in the past, is likely inadmissible at trial on its own.

"38931" and "38929".  I observed SUBJECT VEHICLE #1, a silver
Mercedes bearing California license plate 8GJJ909, parked in the
driveway of the residence, in front of the rear/west unit.  DMV
records indicate the vehicle has a release of liability to
TERRANCE PEARSON.

22.  On May 15, 2021, I returned to the SUBJECT RESIDENCE
and saw a man who I believed to be PEARSON based on a comparison
with his DMV photo among other reasons.  I saw PEARSON closing
the driver's door to SUBJECT VEHICLE #2, a black Dodge Charger
bearing California license plate of 8EPB809, which was parked
along the curb in front of the SUBJECT RESIDENCE.  DMV records
indicate the vehicle has a release of liability to TERRANCE
PEARSON.

23.  On May 25, 2021, I returned to the SUBJECT RESIDENCE
and observed SUBJECT VEHICLE #1 parked in the driveway of the
SUBJECT RESIDENCE, in front of the rear/west unit.  I also
observed SUBJECT VEHICLE #2 parked along the curb in front of
the SUBJECT RESIDENCE.[3]

24.  The premises of the duplex contain two mailboxes
marked with the numbers "38929" and "38931".  The two units in
the duplex are not individually marked.  However, several
surrounding duplexes in the neighborhood are laid out in a
nearly identical design.  Each of these other duplexes are
marked with the lower numbered address in the front, closer to
the street, and the higher numbered address in the rear.  Based

---

[3] Law enforcement also saw a silver BMW registered to this
address parked nearby.  This car was not registered to PEARSON,
and law enforcement does not seek to search this silver BMW.

8

on my experience, I know that typically street addresses are laid out in a uniform fashion along a street.  Additionally, two vehicles associated with PEARSON, who in turn is associated with the 38931 residence, were parked in the driveway in front of the rear/west unit.  Based on these facts, I believe the residence of 38931 9th Street East, Palmdale, California is the rear/west unit of the duplex.

## VII.  TRAINING AND EXPERIENCE REGARDING ROBBERY

25.  Based on my knowledge, training, and experience, as well as information related to me by other law enforcement officers and postal inspectors, I know that:

a.  Robbers often use electronic devices such as cellular telephones in order to communicate with co-conspirators or to plan their illicit activities or to discuss or boast about recently completed robberies.  The purpose of the robbers' communications on their phones is to facilitate their illicit activities or to coordinate their movements with co-conspirators, or promote their success.  These communications often include phone calls, text messaging, and email communications, or exchanges of pictures of items collected to prepare for the robbery or proceeds of the robbery with co-conspirators, and these communications often occur in advance of the robbery and following the robbery.

b.  Robbers also often store the evidence and proceeds of their robbery in easily accessible, but secure locations such as their home and car(s).

c.  Robbers have been known to take photographs and videos of themselves, their criminal associates, their real and personal property, and evidence of their illicit activities. Such items are often stored in their digital devices or on their social media accounts.

d.  Data contained on electronic devices used by robbers often includes, among other things, records of telephone calls, text messages, social media, and e-mail communications with co-conspirators; photos and recordings of illicit activities; Global Positioning System (GPS) information and other location information that can help identify stash locations, meeting places, and potential future targets; and information that can be used to identify co-conspirators, such as contact lists, calendar appointments, photographs, and videos.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

11

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

e.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PEARSON's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of PEARSON's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

29.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

30.  For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 and B-2, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found in the SUBJECT RESIDENCE, SUBJECT VEHICLES, and from the SUBJECT PERSON, as described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of July, 2021.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

15

EXHIBIT 1

```
                                    ┌─────────────────────────┐
                                    │         FILED           │
                                    │ CLERK, U.S. DISTRICT COURT│
                                    │                         │
                                    │      2/19/2021          │
                                    │                         │
                                    │ CENTRAL DISTRICT OF CALIFORNIA│
                                    │ BY:        JB      DEPUTY │
                                    └─────────────────────────┘
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>KALEB WILLIAMS,<br>GILBERT ALEXANDER BAILEY, JR.,<br>TEVAUGHN BROWN,<br>TERRANCE CLEYON PEARSON,<br>DA'MARI MARIO CRANE, and<br>TONISHA MARIE JOHNSON,<br><br>        Defendants. | CR   2:21-cr-00065-FLA<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1951(a): Conspiracy to Interfere with Commerce by Robbery and Interference with Commerce By Robbery; 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii): Possess, Use, Carry, Brandish, and Discharge a Firearm in Furtherance of and During and in Relation to a Crime of Violence; 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition 18 U.S.C. §§ 981(a)(1)(C), 924(d)(1) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1951(a)]

[DEFENDANTS WILLIAMS, BAILEY, AND JOHNSON]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1      1.   AV Jewelry Mart ("AV Jewelry"), a commercial jewelry store,
2  located at 2011 West Avenue J, Lancaster, California, regularly
3  accepted credit cards as tender for purchase transactions.

4      2.   AV Jewelry obtained goods to be sold in its store from
5  outside California, including from Georgia and Texas.

6      3.   AV Jewelry had a remote door lock that could only be opened
7  by an employee remotely disengaging the lock.

8  B.   OBJECT OF THE CONSPIRACY

9      Beginning on a date unknown, and continuing to on or about July
10  23, 2019, in Los Angeles County, within the Central District of
11  California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR.,
12  and TONISHA MARIE JOHNSON conspired with others known and unknown to
13  the Grand Jury to knowingly and intentionally interfere with commerce
14  by robbery, in violation of Title 18, United States Code, Section
15  1951(a).

16  C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
17      ACCOMPLISHED

18      The object of the conspiracy was to be accomplished, in
19  substance, as follows:

20      1.   On the day of the robbery, defendants WILLIAMS and JOHNSON
21  would contact each other to discuss and plan the robbery.

22      2.   Defendant WILLIAMS would travel to the location around AV
23  Jewelry to serve as a lookout during the robbery.

24      3.   Just prior to the robbery, defendant JOHNSON would enter AV
25  Jewelry pretending to be a customer so that she could hold the door
26  for co-conspirators to defeat the remote lock.

27

28

1      4.   Defendant BAILEY and three co-conspirators, Individuals 1,

2  2 and 3, would grab the open door from defendant JOHNSON and enter AV

3  Jewelry to commit the armed robbery.

4      5.   Individual 1 and Individual 2 would assist in the robbery

5  by brandishing firearms to control store employees during the

6  robbery.

7      6.   Individual 1 would steal AV Jewelry's firearm and give it

8  to Individual 2, who would then point the stolen firearm at the

9  victims.

10      7.   Individual 3 would use a hammer and smash jewelry display

11  cases while defendant BAILEY would fill defendant BAILEY's bag with

12  jewelry.

13      8.   Individuals 1, 2, and 3, and defendant BAILEY would then

14  flee and enter defendant BAILEY's blue Honda and be driven away by

15  Individual 4.

16  D.   OVERT ACTS

17      In furtherance of the conspiracy, and to accomplish the object

18  of the conspiracy, on or about the following dates, defendants

19  WILLIAMS, BAILEY, and JOHNSON, and Individuals 1, 2, 3, and 4, and

20  others known and unknown to the Grand Jury, committed various overt

21  acts within the Central District of California, including, but not

22  limited to, the following:

23      Overt Act No. 1:   On or about July 21, 2019, by text message

24  using coded language, defendant JOHNSON texted defendant WILLIAMS to

25  ask how she could get involved in defendant WILLIAMS's planned

26  robbery.

27

28

1       Overt Act No. 2:   On or about July 23, 2019, driving a tan

2   Chrysler Concorde, defendant WILLIAMS traveled to the area of the AV

3   Jewelry parking lot.

4       Overt Act No. 3:   On or about July 23, 2019, by text message

5   using coded language, defendant WILLIAMS told defendant JOHNSON that

6   he needed somebody to take a piece of jewelry into the AV Jewelry

7   when AV Jewelry opened.

8       Overt Act No. 4:   On or about July 23, 2019, CC-4, driving

9   defendant BAILEY's blue Honda, carrying defendant BAILEY, Individuals

10   1, Individual 2, and Individual 3 as passengers, reversed into a

11   parking spot near the entrance of AV Jewelry.

12       Overt Act No. 5:   On or about July 23, 2019, defendant JOHNSON

13   parked a light blue Dodge Stratus with yellow paper plates around the

14   corner from AV Jewelry.

15       Overt Act No. 6:   On or about July 23, 2019, defendant JOHNSON

16   got out of the light blue Dodge Stratus and walked toward AV Jewelry.

17       Overt Act No. 7:   On or about July 23, 2019, defendant JOHNSON

18   approached the door of AV Jewelry and waited for the employees at AV

19   Jewelry to remotely unlock the door.

20       Overt Act No. 8:   On or about July 23, 2019, following

21   defendant WILLIAMS's instructions, defendant JOHNSON handed an

22   employee of AV Jewelry a bracelet to clean.

23       Overt Act No. 9:   On or about July 23, 2019, defendant JOHNSON

24   walked to the front door of AV Jewelry and slowly opened the door, so

25   that defendant BAILEY and Individuals 1, 2, and 3 would have an

26   opportunity to enter AV Jewelry.

27       Overt Act No. 10:   On or about July 23, 2019, immediately after

28   defendant JOHNSON opened and held open the door of AV Jewelry,

1  defendant BAILEY, Individual 1, Individual 2, and Individual 3,

2  wearing face masks, got out of defendant BAILEY's blue Honda, grabbed

3  the open door from defendant JOHNSON, and entered AV Jewelry.

4      Overt Act No. 11:   On or about July 23, 2019, Individual 1 and

5  Individual 2 each brandished black handguns and used the handguns to

6  control and intimidate AV Jewelry store employees ("Employee-Victim

7  1" and "Employee-Victim 2") and a customer who was present inside the

8  store (the "Customer Victim").

9      Overt Act No. 12:   On or about July 23, 2019, Individual 1

10 pointed a firearm at Employee-Victim 1, ordered Employee-Victim 1 to

11 get down, and threatened to shoot Employee-Victim 1 if he moved.

12     Overt Act No. 13:   On or about July 23, 2019, Individual 3

13 grabbed a hammer from defendant BAILEY's bag and began smashing

14 display cases.

15     Overt Act No. 14:   On or about July 23, 2019, defendant BAILEY

16 began grabbing jewelry from smashed display cases and putting the

17 jewelry in his bag.

18     Overt Act No. 15:   On or about July 23, 2019, Individual 1

19 stole a Glock 19 9mm firearm from a desk in AV Jewelry and handed the

20 stolen firearm to Individual 2.

21     Overt Act No. 16:   On or about July 23, 2019, Individual 2

22 brandished and aimed the stolen Glock firearm at Employee-Victim 2 to

23 control and intimidate Employee-Victim 1, Employee-Victim 2, and the

24 Customer-Victim.

25     Overt Act No. 17:   On or about July 23, 2019, defendant BAILEY,

26 Individual 1, Individual 2, and Individual 3 fled AV Jewelry with

27 approximately 348 pieces of jewelry worth approximately $479,900 and

28

1  a stolen Glock firearm worth approximately $700, having caused

2  approximately $5,000 in damage to the jewelry display cases.

3      Overt Act No. 18:   On or about July 23, 2019, defendant BAILEY,

4  Individual 1, Individual 2, and Individual 3 entered the passenger

5  seats of defendant BAILEY's blue Honda.

6      Overt Act No. 19:   On or about July 23, 2019, Individual 4

7  drove defendant BAILEY's blue Honda, carrying defendant BAILEY,

8  Individual 1, Individual 2, and Individual 3, through the parking lot

9  away from AV Jewelry.

10     Overt Act No. 20:   On or about July 23, 2019, defendant

11  WILLIAMS, driving his tan Chrysler, waited for defendant BAILEY's

12  blue Honda, driven by Individual 4, to pass him and then the blue

13  Honda out of the AV Jewelry parking lot.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. §§ 1951(a), 2(a)]

[DEFENDANTS WILLIAMS, BAILEY, AND JOHNSON]

On or about July 23, 2019, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., and TONISHA MARIE JOHNSON, and others known and unknown, each aiding and abetting the other, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly and willingly committing robbery, in that defendants WILLIAMS, BAILEY, and JOHNSON, and others known and unknown, unlawfully took and obtained property consisting of approximately 348 pieces of jewelry worth approximately $479,000, belonging to AV Jewelry, located at 2011 West Avenue J, Lancaster, California, a commercial jewelry store, the inventory of which travels in interstate commerce, from the person and in the presence of employees of AV Jewelry, against their will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to their persons.

COUNT THREE

[18 U.S.C. §§ 924(c)(1)(A)(ii), 2(a)]

[DEFENDANTS WILLIAMS, BAILEY, AND JOHNSON]

On or about July 23, 2019, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., and TONISHA MARIE JOHNSON, and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried firearms, including a Glock 19, 9mm firearm stolen from AV Jewelry, during and in relation to, and possessed those firearms in furtherance of, a crime of violence, namely, interference with commerce by robbery, in violation of Title 18, United States Code, Section 1951(a), as charged in Count Two of this Indictment, and, in so doing, brandished those firearms.

COUNT FOUR

[18 U.S.C. § 1951(a)]

[DEFENDANTS WILLIAMS, BAILEY, BROWN, PEARSON, AND CRANE]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Party City, a national retail store, sold and distributed products in, and affecting, interstate commerce.

2.   On October 25, 2019, defendant DA'MARI MARIO CRANE was an employee at the Party City store located at 39451 10th Street West, Palmdale, California (the "Party City").

3.   Home Depot, a national hardware store, sold and distributed products in, and affecting, interstate commerce.

4.   From on or about February 11, 2020 to on or about March 12, 2020, defendant CRANE was employed as a cashier at the Home Depot store located at 44226 20th Street West, Lancaster, California (the "Home Depot").   Defendant CRANE's last day of work at Home Depot was on or about March 5, 2020.

B.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about May 3, 2020, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., TEVAUGHN BROWN, TERRANCE CLEYON PEARSON, and CRANE conspired with others known and unknown to knowingly and intentionally interfere with commerce by robbery, in violation of Title 18, United States Code, Section 1951(a).

C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendant CRANE would use inside information about his employers, including where his employers stored cash out of public view, to assist in robberies.

2.   Shortly before the robberies, defendants WILLIAMS and BAILEY would plan the precise timing of the robberies by calling each other and coordinating over the phone.

3.   Defendants BAILEY, BROWN, and PEARSON, and another co-conspirator would enter the store and commit a robbery by either overpowering or threatening at least one employee victim.

4.   Defendant BAILEY would collect money from an employee area not in public view, while another co-conspirator either intimidated or overpowered at least one employee victim.

5.   Defendant CRANE would either pretend to be employee victim of the robbery in order to assist co-conspirators in the robbery or be part of the robbery crew and intimidate an employee to facilitate the robbery.

6.   In furtherance of the robbery, defendant BROWN would discharge a firearm at a glass door to create a path for his and defendant PEARSON's escape.

7.   Defendant WILLIAMS would monitor the robberies from a nearby car as a lookout.

D.   OVERT ACTS

In furtherance of the conspiracy, and to accomplish the object of the conspiracy, on or about the following dates, defendants

10

1  WILLIAMS, BAILEY, BROWN, PEARSON, and CRANE, and others known and

2  unknown to the Grand Jury, committed various overt acts within the

3  Central District of California, including, but not limited to, the

4  following:

5      1.   The October 25, 2019 Party City Robbery

6      Overt Act No. 1:    On an unknown date prior to October 25,

7  2019, defendant CRANE told a co-conspirator that Party City employees

8  sometimes store cash in a back office not in public view.

9      Overt Act No. 2:    On or about October 25, 2019, defendant

10 WILLIAMS acted as a lookout in the vicinity of Party City during the

11 armed robbery.

12     Overt Act No. 3:    On or about October 25, 2019, defendants

13 WILLIAMS and BAILEY spoke over the phone to discuss the plan for the

14 armed robbery.

15     Overt Act No. 4:    On or about October 25, 2019, defendant

16 BAILEY's Nissan Maxima, with collision damage on the passenger side

17 door (the "Nissan Maxima"), entered the shopping center where the

18 Party City is located.

19     Overt Act No. 5:    On or about October 25, 2019, defendant

20 CRANE arrived at the shopping center where Party City is located and

21 got out of a car, across the parking lot from the Party City.

22     Overt Act No. 6:    On or about October 25, 2019, defendant

23 CRANE walked through the parking lot towards the Party City, and as

24 defendant CRANE passed defendant BAILEY's Nissan Maxima, two co-

25 conspirators got out of the Nissan Maxima and followed defendant

26 CRANE to the Party City.

27

28

1    Overt Act No. 7:   On or about October 25, 2019, as defendant
2    CRANE approached the Party City, a third co-conspirator got out of a
3    dark sedan (the "dark sedan").

4    Overt Act No. 8:   On or about October 25, 2019, defendant
5    CRANE arrived at the front sliding glass doors of the Party City and
6    began knocking.

7    Overt Act No. 9:   On or about October 25, 2019, just after an
8    employee unlocked the Party City doors and opened them, defendant
9    CRANE stepped into the doorway, and pushed the doors open further
10   with his left forearm, so that defendants BAILEY, BROWN, and PEARSON
11   could enter more easily to commit the robbery.

12   Overt Act No. 10:   On or about October 25, 2019, as defendant
13   CRANE stepped into the Party City, defendants BAILEY, BROWN and
14   PEARSON rushed from behind defendant CRANE and shoved defendant CRANE
15   and Party City Employee-Victim 1 to the ground.

16   Overt Act No. 11:   On or about October 25, 2019, one of the co-
17   conspirators used force to control, subdue, and intimidate Party City
18   Employee-Victim 1 and Party City Employee-Victim 2, by dragging Party
19   City Employee-Victim 1 through the store by her shirt while co-
20   conspirators ran to the back office to steal money from the Party
21   City.

22   Overt Act No. 12:   On or about October 25, 2019, defendants
23   BAILEY and BROWN entered the back office of the Party City, where
24   defendant BAILEY stole approximately $10,000 in cash from Party City
25   and placed it in his bag.

26   Overt Act No. 13:   On or about October 25, 2019, defendants
27   BROWN and PEARSON returned to the front door, discovered that the
28

1  front sliding door had been locked, and attempted to force their way

2  out by ramming, kicking, and smashing carts into the door.

3      Overt Act No. 14:    On or about October 25, 2019, defendant

4  BROWN, removed a black Sig Sauer, Model P220, .45 caliber handgun

5  from his waistband and fired the handgun into the glass door,

6  shattering the glass to create an escape path.

7      Overt Act No. 15:    On or about October 25, 2019, immediately

8  after defendant BROWN fired his handgun inside Party City, a co-

9  conspirator turned on the Nissan Maxima's headlights and drove

10  towards the Party City at high speed.

11     Overt Act No. 16:    On or about October 25, 2019, immediately

12  after defendant BROWN fired his handgun inside Party City, a co-

13  conspirator turned on the dark sedan's headlights and drove north

14  towards where the Nissan Maxima had been parked.

15     Overt Act No. 17:    On or about October 25, 2019, defendants

16  BROWN and PEARSON fled through the parking lot on foot towards where

17  the Nissan Maxima had been parked.

18     Overt Act No. 18:    On or about October 25, 2019, defendant

19  PEARSON called defendant WILLIAMS, and they spoke for approximately

20  three minutes regarding the plan to escape the area.

21     Overt Act No. 19:    On or about October 25, 2019, defendant

22  BAILEY fled out of a back door of the Party City.

23     Overt Act No. 20:    On or about October 25, 2019, defendants

24  BROWN and PEARSON discarded some of the items of clothing they wore

25  during the robbery, and defendant BROWN discarded the firearm he

26  discharged in furtherance of the robbery.

27

28

2.   The May 3, 2020 Home Depot Robbery

Overt Act No. 21:   On or about May 1, 2020, defendants BAILEY, CRANE, and WILLIAMS, and other co-conspirators, entered the Home Depot to scout it for a potential robbery.

Overt Act No. 22:   On or about May 2, 2020, defendants BAILEY and CRANE, and other co-conspirators, entered the Home Depot and loitered near the vault room to scout it for a potential robbery.

Overt Act No. 23:   On or about May 3, 2020, defendant WILLIAMS arrived at the Home Depot parking lot in a white Chrysler Pacifica bearing unknown license plates (the "Chrysler Pacifica") and entered the Home Depot.

Overt Act No. 24:   On or about May 3, 2020, defendant WILLIAMS, who was inside of the Home Depot at that time, called defendant BAILEY to discuss the plan for the armed robbery.

Overt Act No. 25:   On or about May 3, 2020, defendants BAILEY and CRANE arrived at the Home Depot and went inside.

Overt Act No. 26:   On or about May 3, 2020, defendant WILLIAMS left the Home Depot without purchasing anything and jogged to the Chrysler Pacifica, where defendant WILLIAMS removed the Chrysler Pacifica's license plates.

Overt Act No. 27:   On or about May 3, 2020, defendant WILLIAMS, in the Chrysler Pacifica no longer bearing license plates, drove out of the Home Depot parking lot to the rear alley of a U-Haul store adjacent to the rear of the Home Depot.

Overt Act No. 28:   On or about May 3, 2020, defendants CRANE and BAILEY approached the vault room and controlled and intimidated Home Depot Employee-Victim 1 to open the vault while defendant CRANE held what appeared to be a black handgun.

1    Overt Act No. 29:   On or about May 3, 2020, defendants BAILEY

2    and CRANE grabbed approximately $6,828 from the vault and fled out of

3    the back of the Home Depot to the Chrysler Pacifica.

4    Overt Act No. 30:   On or about May 3, 2020, defendants

5    WILLIAMS, BAILEY, and CRANE fled from the area of the robbery in the

6    Chrysler Pacifica.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FIVE

[18 U.S.C. §§ 1951(a), 2(a)]

[DEFENDANTS WILLIAMS, BAILEY, BROWN, PEARSON, AND CRANE]

On or about October 25, 2019, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., TEVAUGHN BROWN, TERRANCE CLEYON PEARSON, and DA'MARI MARIO CRANE, and others known and unknown, each aiding and abetting the other, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly and willingly committing robbery, in that defendants WILLIAMS, BAILEY, BROWN, PEARSON, and CRANE unlawfully took and obtained property consisting of approximately $10,000 in cash, belonging to Party City, located at 39451 10th Street West, Palmdale, California, a national retail store, the inventory of which travels in interstate commerce, from the person and in the presence of employees of Party City, against their will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to their persons.

COUNT SIX

[18 U.S.C. §§ 924(c)(1)(A)(iii), 2(a)]

[DEFENDANTS WILLIAMS, BAILEY, BROWN, PEARSON, AND CRANE]

On or about October 25, 2019, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., TEVAUGHN BROWN, TERRANCE CLEYON PEARSON, and DA'MARI MARIO CRANE, and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried a firearm, namely, a black Sig Sauer, Model P220, .45 caliber handgun, bearing serial number G502547, during and in relation to, and possessed that firearm in furtherance of, a crime of violence, namely, interference with commerce by robbery, in violation of Title 18, United States Code, Section 1951(a), as charged in Count Five of this Indictment, and, in so doing, discharged that firearm.

COUNT SEVEN

[18 U.S.C. §§ 1951(a), 2(a)]

[DEFENDANTS WILLIAMS, BAILEY, AND CRANE]

On or about May 3, 2020, in Los Angeles County, within the Central District of California, defendants KALEB WILLIAMS, GILBERT ALEXANDER BAILEY, JR., and DA'MARI MARIO CRANE, and others known and unknown, each aiding and abetting the other, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly and willingly committing robbery, in that defendants WILLIAMS, BAILEY, and CRANE unlawfully took and obtained property consisting of approximately $6,828 in cash, belonging to Home Depot, located at 44226 20th Street West, Lancaster, California, a national hardware store, the inventory of which travels in interstate commerce, from the person and in the presence of an employee of Home Depot, against the employee's will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to the person of the employee.

COUNT EIGHT

[18 U.S.C. § 922(g)(1)]

[DEFENDANT BAILEY]

On or about October 28, 2020, in Los Angeles County, within the Central District of California, defendant GILBERT ALEXANDER BAILEY, JR. knowingly possessed a firearm, namely, a Glock, Model 26, 9mm semi-automatic handgun, bearing serial number CUW216US, and ammunition, namely, approximately 10 rounds of Federal Cartridge Company 9mm ammunition, in and affecting interstate and foreign commerce.

Defendant BAILEY possessed such firearm and ammunition knowing that he had previously been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1) Burglary With a Prior Felony, in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of Los Angeles, case number NA053870, on or about April 8, 2003; and

(2) Felon/Addict in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court for the State of California, County of Los Angeles, case number BA419989, on or about June 23, 2014.

FORFEITURE ALLEGATION ONE

[18 U.S.C. §§ 981(a)(1)(C), 924(d)(1) and 28 U.S.C. § 2461(c)]

1.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One, Two, Four, Five, or Seven of this Indictment.

2.  Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses;

(b)  All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(c)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

1   substantially diminished in value; or (e) has been commingled with

2   other property that cannot be divided without difficulty.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth any of Counts Three, Six, or Eight of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

1   substantially diminished in value; or (e) has been commingled with

2   other property that cannot be divided without difficulty.

3

4

5                                       A TRUE BILL

6

7                                         /S/

                                    Foreperson

8

9   TRACY L. WILKISON
    Acting United States Attorney

10

11   *Brandon Fox*

12   BRANDON D. FOX
    Assistant United States Attorney

13   Chief, Criminal Division

14   JOANNA M. CURTIS
    Assistant United States Attorney

15   Chief, Violent and Organized
    Crime Section

16

17   SCOTT M. LARA
    Assistant United States Attorneys

18   Violent and Organized Crime
    Section

19

20

21

22

23

24

25

26

27

28

Exhibit 2

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original  ☐ Duplicate Original

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 01/25/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: DM DEPUTY |

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 01/25/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: KL DEPUTY |

United States of America

v.

GILBERT BAILEY,
TEVAUGHN BROWN, and
TERRANCE PEARSON

    Defendants

Case No. 2:21-mj-00414

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 25, 2019, within the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1951(a) | Interference with Commerce by Robbery |
| 18 U.S.C §§ 924(c)(i), (ii), (iii), 2(a) | Aiding and Abetting the Use and Carry of a Firearm During and In Relation to a Crime of Violence, Possession of a Firearm in Furtherance of a Crime of Violence, Brandishing a Firearm in Furtherance and During a Crime of Violence, and Discharging a Firearm in Furtherance and During a Crime of Violence |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Daniel Ament, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  January 25, 2021

_____Alicia G. Rosenberg_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Daniel Ament, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a peace officer for the Los Angeles County Sheriff's Department ("LASD"), and have been so employed since 2006.  I am currently a sworn Task Force Officer ("TFO") for the joint Federal Bureau of Investigations/Los Angeles County Sheriff's Department Los Angeles Metropolitan Violent Crime Task Force.

2.    I have received training in the Los Angeles County Sheriff's Department Academy, Jail Operations, Patrol School, and Investigator Training relating to crimes and investigations associated with firearms, robberies, assaults, and street gangs. I have attended a forty-hour training class regarding the cellular telephone network, records, and mapping.

3.    I have been assigned to primarily investigate robberies since 2011.  During those investigations, I have used a variety of investigative techniques, including victim, witness and suspect interviews, examining physical evidence, and reviewing surveillance videos, cellular telephone data and social media accounts.  As a result of this experience and my conversations with other law enforcement personnel, to include FBI Special Agents and other LASD Detectives experienced with commercial robbery investigations, I am familiar with the methods used by individuals to commit commercial robberies as well as effective investigative methods to solve them.

1

## II.  **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a criminal complaint against GILBERT BAILEY ("BAILEY"), TEVAUGHN BROWN ("BROWN"), and TERRANCE PEARSON ("PEARSON") for a violation of 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery) and 18 U.S.C. §§ 924(c)(1)(i), (ii), (iii), 2(a) (Aiding and Abetting the Use and Carry of a Firearm During and In Relation to a Crime of Violence, Possession of a Firearm in Furtherance of a Crime of Violence, Brandishing a Firearm in Furtherance and During a Crime of Violence, and Discharging a Firearm in Furtherance and During a Crime of Violence).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, victims, witnesses, cellular telephone data, surveillance footage, deoxyribonucleic acid ("DNA") evidence, and other evidence.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. **SUMMARY OF PROBABLE CAUSE**

6.    From July 23, 2019, to May 3, 2020, a series of at least three commercial robberies were committed by a group of individuals who appeared to use a firearm in furtherance of these robberies.  Law enforcement believes these three robberies

2

are connected, with common suspects and tactics.  I am the detective assigned to investigate these three robberies.

7.   As detailed below, BAILEY, BROWN, and PEARSON, among others, participated in the commercial robbery charged in this complaint, namely an October 25, 2019 of a Party City in Palmdale, California.  During the course of this robbery, the robbers obtained $10,000 from Party City, and discharged a firearm.

8.   At his post-arrest interview, BAILEY admitted his involvement in the Party City Robbery, including that he provided the real handgun to a co-conspirator to use at the robbery and that the handgun was never returned to him following the robbery.

9.   Law enforcement searched the path of travel of the robbery suspects who fled from the Party City.  Near their suspected escape routes, law enforcement found clothing and a firearm which matched the items used by the robbers in the surveillance footage.  Law enforcement conducted a DNA examination on the clothing and firearm.  The DNA results on the clothing found DNA consistent with BAILEY, BROWN, and PEARSON's DNA on some of the recovered clothing items.  The DNA results from the firearm found DNA consistent with BROWN's (primary contributor) and BAILEY's (minor contributor) DNA.

## IV.  **PROBABLE CAUSE**

A.  **The Robbery at Party City on October 25, 2019**

   1.  The Robbery

10.  On October 25, 2019, at approximately 5:50 a.m., witnesses describe, and surveillance footage subsequently showed, that multiple robbers, at least one of which was armed with a loaded firearm, entered and robbed a Party City in Palmdale, California located at 39451 10th Street West.

11.  During the course of the investigation, I interviewed victims, witnesses and suspects, collected and reviewed surveillance video from multiple cameras, collected and examined physical evidence, spoke to other law enforcement officers, and reviewed cellular telephone data related to the robbery at Party City in Palmdale, California.  Based on this, I am aware of the following, in part:

*a. Before the Robbery*

12.  At approximately 5:32 a.m. a light-colored Nissan Maxima (the "Nissan") with collision damage on the passenger side door entered the shopping center were Party City is located.  The Nissan parked in the northeast side of the parking lot, facing south toward the front of Party City.

   a.  According to DMV records, BAILEY is the registered owner of a gray Nissan Maxima.  In a later traffic stop on BAILEY's Nissan Maxima, BAILEY was driving and law enforcement saw the passenger side door had collision damage consistent with the Nissan used in the Party City robbery.

4

13. At approximately 5:47 a.m. employee D.C. arrived at the shopping center, in what he later told LASD deputies was a ride share vehicle. D.C. got out of the rear passenger side of the car, which dropped him off in the northeast corner of the parking lot, near the Nissan. According to google maps, Party City appears to be located on the west side of the parking lot.

14. As D.C. walked southwest through the parking lot toward Party City, he passed by the Nissan. Two suspects got out of the Nissan and followed behind him.

15. As D.C. approached the front doors, a third suspect got out of another car, a dark colored 4-door sedan, which was parked closer to Party City.

16. Based on my review of DMV records, BAILEY is the registered owner of a gray Nissan Maxima and a blue Honda Accord, which are consistent with both vehicles.

17. Based on later recovered evidence, including DNA evidence, and phone records, law enforcement believes that these three robbers were BROWN, BAILEY, and PEARSON.

18. At approximately 5:49 a.m., D.C. arrived at the front sliding glass doors of the Party City and began knocking on the door.

### b. *Party City Robbery*

19. At approximately 5:50 a.m., an employee unlocked the front doors to allow D.C. inside. As D.C. entered, D.C. paused in the doorway and appeared to place his left forearm on the side of the sliding doors, pushing them further apart. After

D.C. entered, three masked robbers rushed from behind D.C., pushing D.C. and another employee to the ground, and continued to run to the back of the store.

20.  Two employees and D.C. left the store through the sliding front door.  One of the employees closed the sliding front doors and locked them from the outside.

21.  Two of the robbers entered the rear office.  One robber appeared to be holding a black semi-automatic handgun in one hand.  Another robber collected money and placed it into a black duffle bag.

22.  At approximately 5:51 a.m., two of the robbers, later identified as BROWN and PEARSON, returned to the front doors and attempted to exit, but quickly discovered the sliding glass doors were locked.  The robbers attempted to push, kick and ram the doors open with a shopping cart, however the door remained closed.  One of the robbers produced a black semi-automatic handgun from his waist band and fired a round at the door, shattering the glass.  The two robbers escaped through the broken door and ran northeast through the parking lot.

23.  At approximately 5:53 a.m., the third robber with the duffle bag containing the stolen money approached the broken front door.  The robber was holding his left hand to the left side of his face and appeared to be using a cellphone.  The robber then went back into the store and is believed to have exited from a different door.

2.    Subsequent Investigation

24.    The employee victims described the suspects as all men.  Party City stated that they lost approximately $10,000 in cash during the robbery, and the doors would cost approximately $1,000 to fix.

25.    Based on my comparison of the surveillance footage, the robber which BAILEY later admitted was him, appeared to be wearing similar clothing to a suspect from another robbery at A.V. Jewelry.  These similarly clothed robbers were wearing a black hooded sweatshirt, gray sweatpants with a torn right rear pocket, and dark Nike shoes with a white logo.

26.    LASD deputies, who responded to the Party City robbery, canvassed the area and located clothing and a stolen black Sig Sauer semi-automatic handgun which had been discarded near neighboring businesses.  The items matched clothing worn by the suspects and the handgun appeared to be the same handgun used during the robbery as captured by surveillance video.

3.    DNA Evidence

27.    The clothing and handgun recovered near the scene of the robbery at Party City were examined for DNA.  During the examination, DNA samples were obtained from the clothing and handgun found near Party City and were submitted to be compared against the Combined DNA Index System ("CODIS").  The comparison with the CODIS system resulted in DNA hits for BAILEY, BROWN, and PEARSON's DNA on some of the recovered items.

28.    PEARSON's DNA CODIS hit was as a majority contributor from a "California Republic" baseball hat found near the scene

of the robbery, and seen being worn by one of the robbers.
BAILEY's DNA CODIS hit was as a minority contributor from the
trigger of the firearm.  BROWN's DNA CODIS hit was as a majority
contributor from a sweatshirt found near the scene of the
robbery.  BROWN's submitted DNA profile was the same DNA profile
as the majority contributor from the trigger of the firearm.

29.  A DNA reference sample was obtained from BAILEY and
BROWN[1] following their arrest, pursuant to a state search
warrant.  The two DNA reference samples were submitted to the
LASD crime lab for comparison to the DNA samples obtained from
the items.  The examination yielded the following results:[2]

a.  Gray "Goodfellow & Co" zip up hooded
sweatshirt: BAILEY (11% contributor)

b.  Black ski mask: BROWN (21% contributor), BAILEY
(16% contributor)

c.  Black "Amongst Others" pull over hooded
sweatshirt: BROWN (98% contributor)

d.  Black left glove: BROWN (97% contributor)

e.  Black do-rag: BROWN (98% contributor)

f.  Black cut off t-shirt sleeve: BROWN (88%

---

[1] Law enforcement investigating this matter arrested BAILEY
and BROWN and obtained DNA samples pursuant to a state warrant.

PEARSON has not yet been located, so law enforcement has
been unable to obtain a DNA sample from him to confirm the CODIS
DNA results.  Once PEARSON is located and arrested, law
enforcement intends to obtain a warrant for a confirmatory DNA
sample from PEARSON.

[2] The results for PEARSON's DNA will not show up in the LASD
DNA confirmation examination until law enforcement obtains and
submits a confirmatory DNA sample from PEARSON.

contributor)

g.  Black cut off t-shirt sleeve: BROWN (98%
    contributor)

h.  Black "Diesel" glove: BROWN (96% contributor)

i.  Trigger and trigger guard of Sig Sauer pistol:
    BROWN (89% contributor), BAILEY (10%
    contributor)

j.  Grip of Sig Sauer pistol: BROWN (98%
    contributor)

k.  Slide and fame of Sig Sauer pistol: BROWN (97%
    contributor), BAILEY (2% contributor)

4.  Telephone Evidence

30.  State search warrants were authored for historical
cell records for telephone numbers that were in communication
with each other who were in communication around the time of the
robbery and were in the vicinity of the robbery.

a.  BAILEY's -7108 Number

31.  BAILEY identified a phone number ending in -7108
("BAILEY's -7108 Number") as his telephone to law enforcement in
his post-arrest interview.[3]  Cell phone records indicate on
October 25, 2019 (i.e., the morning of the Party City robbery
describe above) this phone was using a cellular tower located at
39398 Willowvale Road, Palmdale, CA, in proximity to the
robbery, between 5:32 a.m. and 5:47 a.m.  BAILEY's -7108 number
called a phone number ending in -8118 ("K.W.'s -8118 Number") at

---

[3] BAILEY's -7108 Number was registered to a woman who
previously shared an address with BAILEY.

5:32 a.m. and 5:47 a.m. and received a call from K.W.'s -8118
number at 5:40 a.m.

          b.   K.W.'s -8118 Number

32.   According to phone records, K.W.'s -8118 Number was
registered to K.W.  Cellphone records state that the cellphone
was using a cellular tower located at 39398 Willowvale Road,
Palmdale, CA, in proximity to the robbery, on October 25, 2019
between 5:13 a.m. and 5:47 a.m., and at 1124 West Rancho Vista
Blvd., Palmdale, also within the proximity of the robbery, at
approximately 5:53 a.m.  Among other phone calls at around this
time, K.W.'s -8118 Number was in communication with
BAILEY's -7108 Number just prior to the robbery and received a
call from a number ending in -7960 ("PEARSON's -7960 Number") at
5:53 a.m., just after the robbery concluded.

          c.   PEARSON's -7960 Number

33.   PEARSON's -7960 Number did not have a registered
owner.  However, the California Department of Corrections
("CDCR") and Rehabilitation parole records listed
PEARSON's -7960 Number as PEARSON's phone number.

34.   AT&T's historical precision location information
estimates that just before and after the robbery, at 5:39 a.m.
and 5:53 a.m., PEARSON's -7960 Number's device was likely within
50-100 meters of 39460 11th St West, Palmdale, which abuts the
back of the Party City store.

35.   At about the same time at 5:54 a.m., PEARSON's cell
tower records indicate that PEARSON's -7960 Number was both
using a cellular tower located at 35635 Vista View Terrace,

Palmdale, which is located in the hills approximately 4.7 miles
south of the robbery, and simultaneously a tower at 39702 30th
Street West, Palmdale, which is approximately 2 miles west of
the robbery.  Approximately 9 minutes later, PEARSON's phone was
using a cellular tower at approximately 906 East Avenue R,
Palmdale, approximately 2.8 miles south-east of the robbery.

36.  Because PEARSON's cell tower hits surround the Party
City, and the historical precision location is almost exactly at
Party City, I believe in aggregate there is ample phone location
evidence that PEARSON's -7960 Number was in the vicinity of the
Party City during the robbery.

37.  On October 25, 2019, PEARSON's -7960 Number contacted
a number ending in -0492 ("BROWN's -0492 Number") at 6:03 a.m.,
6:04 a.m. (twice), and 6:17 a.m., just after the robbery.
Additionally, PEARSON's -7960 Number was in contact with K.W.'s
-8118 Number at 3:33 a.m., and 5:54 a.m.

d.   BROWN's -0492 Number

38.  Based on Los Angeles County Inmate Visitation records,
BROWN's -0492 Number was used by BROWN.  Specifically, on an
inmate visitation log, BROWN provided this phone number.[4]  The
account was also later transferred into BROWN's name on June 18,
2020.

39.  According to DMV records, BROWN lives in south Los
Angeles County.

---

[4] Around the time of the robbery, BROWNS's -0492 Number was
registered to a woman who shared an address with BROWN.

11

40.   According to BROWN's -0492 Number records, on October 25, 2019 at approximately 4:50 a.m., the device traveled from south Los Angeles County and arrived in Lancaster.  The device returned to south Los Angeles County at approximately 3:48 p.m. on the same day.

41.   The device did not log any cellular tower location during the robbery or for approximately 2 hours afterwards.  However, on the morning of the robbery, BROWN's -0492 Number received calls (that were forwarded to voicemail) from PEARSON's -7960 Number four times between 6:03 a.m. and 6:17 a.m., and from K.W.'s -8118 Number at 6:29 a.m. and 6:41 a.m.  The lack of cell tower data and calls being forwarded to voicemail is consistent with the phone being powered off.

42.   The next tower ping after the robbery put the BROWN's -0492 Number's location in Lancaster at 8:54 a.m.

5.   BAILEY's Arrest

43.   A state arrest warrant was obtained for BAILEY on October 22, 2020.  On October 28, 2020, BAILEY was located driving a gray Nissan Maxima.  He was stopped and arrested in Los Angeles.

44.   BAILEY's Nissan Maxima had collision damage on the passenger side, which matched the collision damage seen on the video camera footage of the car used in the Party City robbery.  Law enforcement searched the Nissan Maxima and located, among other things, a loaded black Glock 9MM, semi-automatic handgun (SN #CUW216US) in a holster under the driver's seat.

45.   On or about October 28, 2020, a state search warrant was served at BAILEY's residence on W. 78th Street in Los Angeles.  In the room that appeared to belong to BAILEY, law enforcement found CDCR identification in BAILEY's name.  In that same room, law enforcement also recovered a black face mask, and a pair of gray sweatpants with a tear on the right rear pocket which matched the pants worn by one of the suspects during the robberies at Party City and an earlier robbery at A.V. Jewelry, as referenced further below.

6.   BAILEY Post-*Miranda* Statements

a. *BAILEY Admits to Participating in the Party City Robbery*

46.   Following his arrest, on October 28, 2020, law enforcement interviewed BAILEY.  BAILEY waived his *Miranda* rights and the interview was audio recorded.  During the interview, BAILEY admitted the following:

a.   BAILEY confirmed his telephone number as BAILEY's -7108 Number.  He also admitted to being the registered owner for the Nissan, which he identified from a photograph at the traffic stop.  He also stated that he had co-signed for a blue Honda Accord.

b.   BAILEY admitted ownership of the Glock handgun which was recovered under the driver's seat of his Maxima at his arrest.  He identified the handgun from a photograph.

c.   In reference to the Party City robbery, BAILEY identified himself from a surveillance video from Party City as the individual wearing the black hooded sweatshirt, gray

13

sweatpants with the torn pocket and duffle bag.  BAILEY admitted that he provided a .45 caliber handgun to a co-conspirator for use during the robbery.

      d.   While inside the Party City, BAILEY stated he had heard a firearm being shot.  He later fled out the back of the Party City.  He explained that he was afraid to exit through the broken front door because he did not know who shot out the glass.  He claims he was only given approximately $1,000 for his participation.

      e.   BAILEY admitted that he also participated in a 2020 robbery at Home Depot in Lancaster.  BAILEY identified himself from a security still from the Home Depot robbery as the individual wearing the white ear buds, glasses, long sleeve shirt, and dark cargo pants.  He admitted that he and a co-conspirator stole money from the Home Depot vault before fleeing out of the back of the store to a white van.  He claimed he was only was given approximately $1,000 for his participation in this robbery.

      f.   BAILEY was reluctant to discuss any robbery that occurred at A.V. Jewelry, though he did allude to his involvement in this robbery.[5]

---

[5] BAILEY stated A.L. was partially responsible for the robberies.  Following the interview, I located the individual I believe BAILEY was referring to.  However, the individual I located was 45 years old, 5-10 tall and 230 pounds, which did not match the physical description of the individual BAILEY claimed was A.L., nor did any phone or physical evidence point to A.L.'s involvement.  A.L. also did not appear to match any of the robbers on the surveillance footage.

### 7.   <u>BROWN's Arrest and Interview</u>

47.   A state arrest warrant was obtained for BROWN on November 20, 2020.  On December 2, 2020, BROWN was located and arrested during a traffic stop in Compton, California.

48.   On December 2, 2020, following his arrest, law enforcement interviewed BROWN.  BROWN waived his *Miranda* rights and the interview was audio recorded.  BROWN denied knowledge of the robbery at Party City.  He also denied knowing anyone named "Gilbert" (BAILEY) or "Kaleb" (K.W.).

### 8.   <u>Interstate Nexus</u>

49.   On January 15, 2021, I spoke with Angel Alaniz, the store manager of Party City located at 39451 10th Street West, Palmdale, Ca 93551.  She stated Party City is a national chain of retail stores with more than 800 locations throughout the United States.  Party City is owned by AAH Holdings Corporation and is headquartered in Rockaway, New Jersey.  Party City regularly accepts credit cards as tender for purchase transactions.  In addition, Party City obtains goods to be sold in its stores throughout the United States and other countries.

### B.   **Other Suspected Robberies in the Robbery Series**

50.   During the course of the investigation, law enforcement identified other robberies that appeared to be committed by some of the same robbers as the Party City robbery detailed above.  Through the course of this broader investigation I interviewed victims, witnesses and suspects, collected and reviewed surveillance video, collected and

15

examined physical and DNA evidence, and reviewed cellular telephone data.  Based on this, I am aware of the following:

1.   The Robbery at A.V. Jewelry on July 23, 2019

        a.   *The Robbery*

51.   On July 23, 2019 at approximately 12:01 p.m., an armed robbery occurred at A.V. Jewelry located at 2011 West Avenue J, Lancaster, California. Based on my review of the surveillance footage and investigation reports, interviews with witnesses, victims, and suspects, and collection of other evidence, I learned the following:

        a.   There appeared to be multiple cars used during the robbery.  These cars included a dark blue 2016-2017 Honda Accord used by the robbers, and a light blue Dodge Stratus with yellow paper plates, used by T.J. who held the door open for the robbers.  The driver of a tan Chrysler Concorde also appeared to be involved in the robbery based on how the car appears to loiter in the parking lot before and during the robbery, then follows the robbers' car after the robbery.

        b.   At approximately 11:52 a.m., a woman wearing a black, red, white and gray striped collared shirt got out of the Dodge Stratus and walked into A.V. Jewelry.  While inside the store, she had a bracelet steam cleaned by an employee.

        c.   At approximately 12:01 p.m., four masked robbers got out of a dark blue Honda Accord and rushed to enter A.V. Jewelry as the woman left A.V. Jewelry and appeared to hold the door open for the robbers, defeating the remote door lock.

d.   Once the robbers entered, two of the masked robbers brandished firearms at the customer and workers at the business, one of the suspects used a hammer to shatter the glass display tops while another suspect collected jewelry from the shattered displays.

e.   One robber also discovered a victim's firearm, stole it, and handed it to another robber who brandished the stolen firearm.

f.   At approximately 12:03 p.m., the four robbers left the store and got into the blue Honda Accord.  The Honda Accord and the tan Chrysler Concorde then drove through the parking lot and continued north on 20th Street West and out of view.

g.   An employee provided an estimated loss of $479,900 worth of jewelry pending a detailed inventory, $700 for the stolen firearm, and estimated the damage to the display cases at approximately $5,000.

b.   *Identification of Robbery Suspects*

52.  On August 5, 2019, LASD deputies conducted a traffic stop of a light blue Dodge Stratus with yellow paper plates. The deputies identified the driver as T.J.  T.J. provided a telephone number, which was documented on the citation, ("T.J.'s -6418 Number").

53.  I reviewed a DMV photograph of T.J. and a photograph of the vehicle she had been driving.  T.J. matched the appearance of the woman who appeared to hold the door open for the robbers.  In addition, this vehicle, the light blue Dodge

17

Stratus with yellow paper plates, is consistent with the vehicle used by the woman just prior to the robbery.

54.   Law enforcement obtained state search warrants for T.J.'s -6418 Number telephone records, including text message content.   The records indicate T.J.'s -6418 Number received, among other things, two text messages from a number ending in -3505 ("K.W.'s -3505 Number").   The messages were sent at approximately 10:36 a.m. on the morning of the robbery, and read, "Ain't no smokers around here?" and "I need one of them to take this chain[6] in there when they open."

55.   A subsequent state search warrant was authored for K.W.'s -3505 Number.   The records indicate the account was registered to K.W. and the device was using a cellular tower located at 2103 West Avenue J, Lancaster, California, in proximity to the robbery, on July 23, 2019 from 9:08 a.m. to 11:05 a.m., and from 11:42 a.m. to 12:06 p.m.[7]   I reviewed a DMV photograph of K.W.   The photograph matched the appearance of the man on surveillance videos who was seen getting out of the tan Chrysler Concorde that was present in the parking lot before and during the robberies.   The registered owner of the tan Chrysler Concorde, does not match the appearance of anyone believed to be involved in the robbery.

_____

[6] Based on my training and experience, and discussions with other trained investigators, I know that a "chain" is sometimes used as slang for jewelry and could have been referring to the bracelet T.J. had cleaned at A.V. Jewelry.

[7] For the approximately 37 minutes between 11:05 a.m. and 11:42 a.m. the K.W. -3505 Number was mostly pinging off a tower 2 miles south-east of A.V. Jewelry.

56. Additional state search warrants were obtained for historical cell records for telephone numbers in contact with K.W.'s -3505 Number around the time of robbery, which included, among others BAILEY's -7108 Number, and BROWN's -0492 Number.

57. BAILEY's -7108 Number phone records indicate that on July 23, 2019 at 11:49 a.m. the device was using a cellular tower located at 2103 West Avenue J, Lancaster, in close proximity to the robbery. Additionally, as mentioned above, DMV records indicate BAILEY is the registered owner of a blue Honda Accord, which matched the appearance of the car which the four masked robbers used.

58. BROWN's -0492 Number phone records indicate that he traveled from south Los Angeles County, to Lancaster on July 22, 2019. The device returned to south Los Angeles County on July 23, 2019 at approximately 3:33 p.m., a few hours after the robbery. The device did not log any cellular tower activity during the robbery. However, at approximately 11:45 a.m., approximately 16 minutes before the robbery, the phone was using a cellular tower at 43901 Division St., Lancaster, which is approximately 2.2 miles away from the scene of the robbery.

        c.   *Interstate Nexus*

59. On January 15, 2021, I spoke with Anita Manori, the owner of A.V. Jewelry. She stated A.V. Jewelry regularly accepts credit cards as tender for purchase transactions. A.V. Jewelry also obtains goods to be sold in its store from Georgia and Texas.

2.   <u>Robbery at HOME DEPOT on May 3, 2020</u>

a.   *The Robbery*

60.   On May 3, 2020, at approximately 3:01 p.m., an armed robbery occurred at Home Depot located at 44226 20th Street West, Lancaster, California.   Based on my review of law enforcement reports and surveillance video footage, I learned the following:

a.   At approximately 2:44 p.m. two suspects entered Home Depot.   One of the suspects (subsequently identified as BAILEY as described below) was wearing a black beanie, black face mask,[8] a white ear bud, glasses, dark long sleeve shirt, dark cargo pants, and black Nike shoes with white logo and sole.   The other suspect was wearing a black beanie, black face mask, black gloves, tan pants, and black work boots.

b.   At approximately 2:48 p.m. a man jogged toward a white Chrysler Pacifica in the parking lot, where he bent down and appeared to remove the license plates.   The man then drove the Pacifica into the rear alley of the adjacent business and backed it against the wall, which lead to the rear of the Home Depot.   As the Pacifica drove through the Home Depot parking lots, the vehicle's license plates were no longer present.

c.   At approximately 3:01 p.m., the two robbers contacted an employee near the vault room, one robber appeared to be holding a black object, which resembles a firearm.   The victim opened the vault and the two safes located inside.   The robbers collected money from the safes and fled.   Shortly

---

[8] Since the COVID-19 pandemic was ongoing at the time of the robbery, most of the people at Home Depot were wearing masks.

thereafter, the two robbers ran from the back of the store to an awaiting white Chrysler Pacifica, which fled the area.

       d.   The employee was unable to confirm if either suspect was holding a handgun.

       e.   According to Home Depot, the total money lost was approximately $6,828.

       b.   *Subsequent Investigation*

61.   LASD deputies, who responded to the robbery area immediately following the robbery, canvassed the area and located a white Apple Airpod in the rear of Home Depot where the robbers had fled.  The item matched the white Apple Airpod worn by one of the robbers during the robbery.  The Apple Airpod was submitted for DNA examination.  DNA examination determined that BAILEY's DNA was on the Apple Airpod.

62.   Home Depot provided a list of former employees, which included D.C., who was terminated on March 12, 2020 (approximately two months before the robbery) for job abandonment.  Notably, D.C. is the same employee identified above who appeared to wedge the door wider for the robbers in the Party City robbery described above.

63.   As mentioned above, BAILEY identified himself in a still image taken from the surveillance footage of the Home Depot robbery as the individual wearing the white ear buds, glasses, long sleeve shirt, and dark cargo pants.

64.   State search warrants were authored for BAILEY's -7108 Number, and K.W.'s -8118 Number, among others, who were in communication around the time of the robbery.

65.   BAILEY's -7108 Number's phone records indicate the device was using cellular towers located at 2103 West Avenue J, Lancaster, CA 93534, in proximity to the robbery, on May 3, 2020 at 2:40 p.m. and 1651 West Avenue K, Lancaster, California, in proximity to the robbery, on May 3, 2020 at 3:27 p.m.

66.   Phone records indicate that K.W.'s -8118 Number was using a cellular tower located at 2103 West Avenue J, Lancaster, California, in proximity to the robbery, on May 3, 2020 at 2:40 p.m.

c.   *Interstate Nexus*

67.   On January 15, 2021, I spoke with Ruben Banuelos, a Senior Organized Retail Crime Investigator with Home Depot.  He stated that Home Depot is a national chain of retail stores with 1,981 stores throughout the United States.  Home Depot is headquartered in Atlanta, Georgia.  Home Depot regularly accepts credit cards as tender for purchase transactions.  In addition, Home Depot obtains goods to be sold in its store throughout the United States and other countries.

## V. CONCLUSION

68.   For all the reasons described above, there is probable cause to believe that BAILEY, BROWN, and PEARSON violated of 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery) and 18 U.S.C. §§ 924(c)(1)(i), (ii), (iii), 2(a) (Aiding and Abetting the Use and Carry of a Firearm During and In Relation to a Crime of Violence, Possession of a Firearm in Furtherance of a Crime of Violence, Brandishing a Firearm in Furtherance and During a Crime of Violence, and Discharging a Firearm in Furtherance and

22

During a Crime of Violence) for their conduct during the October 25, 2019 robbery at Party City in Palmdale, California.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 25th day of January , 2021.

_Alicia G. Rosenberg_
_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE